# Ferree, Appellant, *v.* United Storage Company.

*Trusts and trustees—Trust ex maleficio—Attorney at law.*

A bill in equity against an attorney at law for an accounting as to certain shares of stock belonging to plaintiff and bought by defendant at sheriff's sale, will be dismissed, where there is no evidence that the defendant was at the time of the sale an attorney for the plaintiff in any form, and it appears that the equity in real estate which the plaintiff had contributed to the corporation for his stock was in fact worthless.

Argued Nov. 4, 1909. Appeal, No. 178, Oct. T., 1909, by plaintiff, from decree of C. P. No. 2, Allegheny Co., Jan. T., 1908, No. 991, dismissing bill in equity in case of John W. Ferree v. R. A. Balph and the United Storage Company. Before FELL, BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ. Affirmed.

Bill in equity to compel the transfers of shares of stock and for an account.

SHAFER, J., filed the following opinion:

The bill is to enjoin the defendant, Balph, from transferring forty-four shares of stock in the United Storage Company, and for an account in regard to those shares and other matters connected with the storage company in which Balph is alleged to be trustee for the plaintiff.

### FINDINGS OF FACT.

1. In the year 1892, the plaintiff and one Stevenson were in the employ of one William R. Hamilton who was conducting a furniture business in the city of Allegheny, and in that year the plaintiff, Stevenson, and several other parties were endeavoring to form a limited partnership to carry on the furniture business, having in contemplation obtaining the use of a disused cotton mill in Allegheny for the purpose of a furniture sales room and warehouse.

2. Through Stevenson, Dr. Howard L. Baird was induced to join with Stevenson and Ferree in the purchase of this cotton mill, to be leased to the furniture company, and the property was purchased by Baird from the owners for $80,000, $10,000 in cash and the balance to be secured by purchase money bond and mortgage. Stevenson being unable to pay his share of the cash payment, Baird took two-thirds of the title and paid two-thirds of the $10,000, and Ferree took the other third, paying one-third of the cash payment.

3. Although plaintiff furnished one-third of the money, he for some reason did not desire to appear in the transaction and he turned over his money to one Robert F. Ramsay, to whom the deed was made and by whom the money was paid to the vendor, and by whom the purchase money mortgage and bond were signed with Baird. Baird knew that Ramsay was in some way holding the title for the plaintiff, but not as to the arrangement between them, or as to who had paid the cash.

4. A limited partnership was thereupon formed in January, 1893, under the name of Ferree, Stevenson & Company, Limited, of which Ferree and Stevenson, but not Baird, were members, and the cotton mill was leased by Baird and Ramsay to the limited company.

5. In July, 1896, Dr. Baird became uneasy about his association with Ramsay, in the apparent ownership of the property, and feared that Ramsay, whom he believed to be a man of no property, might become involved and thereby precipitate a sale of the property subject to so large a mortgage, and spoke to James Balph about the matter and it was arranged between them, and apparently Ferree, that Ramsay should convey the title he had to R. A. Balph. A deed was accordingly made by Ramsay to R. A. Balph for the expressed consideration of $1,000, but admittedly a voluntary deed without consideration. This deed was registered in the city of Allegheny on July 8, 1896. The deed having been lost before recorded another deed was procured from Ramsay to R. A. Balph for the consideration of $1.00, which was recorded.

6. The firm of Ferree, Stevenson & Company, Limited, having made an assignment for the benefit of creditors, and being

unable to pay the rent, the building remained unoccupied and the rent unpaid for some time before March, 1898, except that plaintiff occupied a small part of it without paying any rent and used it as a storage warehouse to a small extent.

7. During the time the building was vacant Baird, with the assistance of James Balph, his attorney, attempted to make a sale of the property but was unable to get an offer sufficient to cover the mortgage, and the property was not at that time worth anything over and above the mortgage securing the bond of Baird and Ramsay.  It was then suggested by Ferree, or by Ferree's use of part of the premises as a storage warehouse, that the whole building might be utilized for storage purposes, and Baird endeavored to organize such a company and induced R. A. and James Balph to agree to take an interest.  Mr. R. A. Balph claims that the first he knew that the property which he held in trust belonged to Ferree was about this time, when negotiations were begun for the formation of this company.  The plaintiff claims that Mr. Balph knew long before that he was the real owner of the interest held by Balph. We deem it entirely immaterial to determine which of them is right in this respect, as the ownership of Ferree was fully acknowledged by Balph and the property conveyed according to his direction.

8. A joint-stock association was formed as a temporary expedient until a charter could be obtained, the articles of association being dated March 28, 1898, and Baird and R. A. Balph conveyed the property to this association.  On May 16, 1898, the United Storage Company was incorporated with a capital stock of 500 shares of stock of a par value of $100 each, which was distributed among certain parties, Ferree, however, not being mentioned, and shortly thereafter the limited company conveyed the property to the corporation.

9. The actual basis upon which this corporation was formed and its stock distributed was that Baird and Ferree should contribute the property in question, subject to the mortgage; that the two Balphs should contribute $10,000; that Baird and Ferree should have such share of the $50,000 capital as was represented by the amount of money which each of them had

put into the property, with interest, and that the Balphs should receive the rest of the stock for the $10,000 to be contributed by them, together with the agreement that the two Balphs should act as attorneys for the company in the matter of its formation and management. This was somewhat modified by the agreement of Baird to put up one-third of the $10,000 instead of the Balphs. The number of shares thus allotted to the plaintiff was forty-four, representing the amount of money which he had put in, with interest, and this allotment was understood and agreed to by him at the time; his certificate of stock was made out in his name for forty-four shares, which, however, he never took out.

10. The cash capital and other moneys raised by loans was used in strengthening the building so as to render it fit for storage purposes, the purchase of wagons and other equipment, and the plaintiff was at first employed as manager and continued in that capacity for some time, when he was discharged.

11. Some time about January, 1900, the plaintiff left the state without informing anyone where he was going, and remained away without informing his family or anyone else of his whereabouts, and remained away over seven years without being heard from by anyone, except as hereafter stated, so that he was by reason of such absence adjudged to be dead and his wife appointed administratrix, and the present suit was begun by her.

12. Some few months after he went away a constable came to the storage company having in his hands an execution against Ferree, to inquire about the interest of Ferree in the company, and this fact came to the knowledge of R. A. Balph who made an investigation and sent someone to buy the judgment for the purpose, as he says, of preventing a stranger from coming into the company by a sale of Ferree's stock. He held this judgment for about a year, and then, having transferred it to the common pleas, issued an execution and sold Ferree's forty-four shares of stock in the storage company and bought the same in for $57.46.

13. On March 10, 1904, Ferree wrote to R. A. and James

Balph from Chicago inquiring about his stock, as to whether it was worth anything, and requesting that the certificate be sent to him.   In answer to this a letter was sent him signed "R. A. and James Balph" in which he was told that the stock had been sold on February 28, 1901, on a judgment of H. A. Thompson, administrator of James C. Thompson, and that the stock had no market value, and that other people had been inquiring about him, and asking whether they should give them his address.   To this Ferree replied that they should tell no one anything about his address or his whereabouts.

14. The present proceeding was begun to January Term, 1908, by the wife of Ferree as his administratrix as above stated, and after an answer had been filed Ferree returned and was under the act substituted for his administratrix and filed the bill, which is substantially the same as that originally filed.

15. The defendants, R. A. Balph and James Balph above mentioned, are brothers and are members of the bar, and from the time of the admission of the younger of them, about 1878, until after all the matters above referred to had taken place, occupied offices together and held themselves out to the public as partners by the name of R. A. & James Balph, although they were not in fact partners but each carried on his own business, having his own clients and making no division of profits with the other.   The connection of each of these gentlemen with the plaintiff as his attorney was as follows: About the year 1892, there was a partition of the estate of plaintiff's father, and James Balph represented the plaintiff in that transaction, having entered appearance, however, in the firm name, and on one occasion R. A. Balph at the request of his brother James went to a meeting of the heirs on the premises, where they were endeavoring to make a partition, and afterward upon adjustment made among the heirs the plaintiff, who took no land, received a certain sum of money which came into the hands of James Balph, who in December, 1896, transmitted to the plaintiff a check of R. A. & James Balph, with an account of the disposition of the money, including fees, which closed the transaction in regard to the partition.

In the spring of 1894, James Balph drew an affidavit of de-

fense for the plaintiff in an action against him on a book account, the appearance being entered in the name of R. A. & James Balph.

16. James Balph examined the title to the cotton mill property when it was purchased as above stated by Baird and Ferree in Ramsay's name, and both R. A. & James Balph have been attorneys for the United Storage Company since its formation.

### CONCLUSIONS OF LAW.

1. The plaintiff claims that upon the above state of facts R. A. Balph is a trustee ex maleficio for John W. Ferree of the forty-four shares of stock above mentioned, as well as any other shares which he may have obtained for the plaintiff's one-third interest in the cotton mill property, upon the ground as we understand it that he was trustee of the plaintiff's interest in the land before it was conveyed to the storage company, and that he was attorney for the plaintiff and, therefore, incapable of buying his shares of stock at sheriff's sale.

2. A great deal of testimony was taken as to Balph's holding the legal title to one-third of the cotton mill property. We are quite unable to see what difference it makes what the details of that matter were, as it is admitted on all hands that Balph did not claim any beneficial interest in the property and acted in Ferree's interest, and, as we have found, he conveyed it according to Ferree's direction for the issue of forty-four shares of stock to Ferree. Ferree well understood that the forty-four shares of stock was all he was getting for his interest in the cotton mill property, but as this is complained of as being in some way in bad faith on the part of the Balphs it may be observed that this interest of Ferree was really worthless. The property could not at that time be sold for enough to pay the mortgage, and Ferree received for his one-third the same relative number of shares which Baird received for his two-thirds interest in the property, which were put into the new company for about 132 shares out of 500, as against the $10,000 to be contributed by the Balphs. As we have said, the property was really worth nothing. We see nothing in this transaction of which Ferree has any right to complain, and with this

transaction the trusteeship of R. A. Balph as to this property came to an end.

3. As to the purchase by R. A. Balph of the forty-four shares at sheriff's sale, we are at a loss to discover any duty resting upon him to refrain from such purchase, or any reason why he should be held to be a trustee of the shares so bought. He was not at that time and had not in any form been an attorney for Ferree, even nominally as partner of his brother, for a long time. Ferree had disappeared, leaving no trace of himself, and his creditors were inquiring about his property. It was natural enough that the other stockholders of the United Storage Company should prefer that the shares, if they were to be sold, should be bought in by one of their number. But, however this may be, as Balph was not attorney or trustee for him in any form for these shares, or in any manner connected with them, he had as good a right to purchase them at sheriff's sale as anyone else.

4. The statute of limitations has been set up by defendants in addition to the other matters herein stated. All the matters herein complained of took place much more than six years before the beginning of this suit, and we see no reason why the statute does not apply.

The bill must, therefore, be dismissed, with costs to be paid by the plaintiff. Let a decree be drawn accordingly.

*Error assigned* was decree dismissing the bill.

*M. H. Stevenson,* with him *Wm. C. Boyd,* for appellant.

*Robert B. Petty,* for appellees.

PER CURIAM, January 3, 1910:

The decree is affirmed at the cost of the appellant on the opinion of the learned judge of the common pleas.